1

2

3

4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| ANTONIO NEAL TOWNSEND, through his Conservator and Guardian ad Litem JACQUELINE TOWNSEND,<br><br>       Plaintiff,<br><br>    v.<br><br>COUNTY OF SANTA CRUZ; SANTA CRUZ COUNTY SHERIFF'S OFFICE; SANTA CRUZ COUNTY HEALTH SERVICES BEHAVIORAL HEALTH DIVISION; TELECARE CORPORATION; and CALIFORNIA FORENSIC MEDICAL GROUP,<br><br>       Defendants. | Case No.  19-cv-00630-BLF<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART TELECARE'S MOTION FOR SUMMARY JUDGMENT; GRANTING CFMG'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART THE COUNTY'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re:  ECF 90, 91, 94] |

      This action was filed in the wake of Plaintiff Antonio Neal Townsend's attempted suicide while he was a detainee at the Santa Cruz County Jail ("the Jail").  Days before the tragic incident, an emergency room doctor placed Townsend on a 5150 hold[1] and referred him to the Santa Cruz Behavioral Health Center ("SCBHC") for evaluation.  Defendant Telecare Corporation, which operates the SCBHC under contract with Santa Cruz County, released Townsend approximately thirty-four hours later.  Townsend immediately robbed two convenience stores, bought and

---

[1] The phrase "5150 hold" derives from California Welfare & Institution Code § 5150, which provides that an individual may be placed in an approved mental health facility for up to 72 hours for evaluation and treatment if the individual is "a danger to others, or to himself or herself, or gravely disabled" as a result of a mental health disorder.  Cal. Welf. & Inst. Code § 5150(a).

United States District Court<br>Northern District of California

ingested heroin, and was arrested and booked into the Jail.  He hanged himself from a railing in his housing unit's day room during his first hour out of his cell.  Townsend, then twenty-two years old, was resuscitated but he suffered severe brain injury and will need care for the rest of his life.

Townsend's grandmother and Guardian ad Litem, Jacqueline Townsend, brought this suit on his behalf.  Townsend claims that the entities responsible for his care at the SCBHC and the Jail violated his rights to adequate medical and mental health care as guaranteed by the Due Process clause of the Fourteenth Amendment.  He also claims that those entities discriminated against him on the basis of his serious mental disability.  Townsend sues Telecare Corporation ("Telecare"); California Forensic Medical Group ("CFMG"); and the County of Santa Cruz, the Santa Cruz Sheriff's Office, and the Santa Cruz County Health Services Behavioral Health Division (collectively, "the County").

Telecare, CFMG, and the County move for summary judgment or, in the alternative, partial summary judgment.  For the reasons discussed below, Telecare's motion is GRANTED IN PART AND DENIED IN PART, CFMG's motion is GRANTED, and the County's motion is GRANTED IN PART AND DENIED IN PART.

## I.      BACKGROUND[2]

On the evening of February 12, 2017, Townsend walked into the emergency department at Dominican Hospital in Santa Cruz, stating that he felt depressed and suicidal.  Dr. Marc Yellin placed him on a 5150 hold and referred him to the SCBHC.  As relevant here, the SCBHC maintains a Crisis Stabilization Program ("CSP") and a Psychiatric Health Facility ("PHF").  The CSP is the designated receiving facility in the County for persons who are placed on a 5150 hold. It is a locked area with reclining chairs rather than beds, as it is intended for stays of twenty-four hours or less, after which the person may be released into the community or hospitalized at the PHF or other inpatient facility.  The PHF is a locked acute care facility with beds where individuals may be housed on an inpatient basis.  Telecare, a private corporation, operates the CSP and the PHF under contracts with the County.

---

[2] The facts in this section are undisputed by the parties.

United States District Court
Northern District of California

1    Townsend was transported to the CSP via ambulance at approximately 12:45 a.m. on

2    February 13, 2017.  During his initial assessment, Townsend stated that he was feeling suicidal

3    and planned to cut himself with a knife.  Townsend was noted to have previous admissions to the

4    CSP on November 26, 2016 and December 18, 2016.  His available history also indicated that he

5    had been arrested by Santa Cruz Police only a few days earlier, on February 8, 2017, for an

6    unknown incident and had been taken to Watsonville Community Hospital for medical clearance

7    prior to booking.  At that time, he reported a history of substance abuse, including use of

8    methamphetamines.  His urine tox screen at the time of his February 13, 2017 admission to the

9    CSP was positive for methamphetamines and opiates.

10    Townsend remained in the CSP for approximately thirty-four hours.  He slept much of that

11    time, and CSP staff noted that he appeared to be sleeping off drug intoxication.  Catherine Louise,

12    LCSW, and Kory Van Unen, ASW, both found Townsend to be sleepy and difficult to engage.

13    However, by the morning of February 14, 2017, Townsend was more coherent.  He denied

14    suicidal ideation and declined substance abuse treatment.  Bernice Ferguson, RN, and Jo E. Morel,

15    MFT, concurred in lifting the 5150 hold, and Townsend was discharged from the CSP at

16    approximately 10:20 a.m. on February 14, 2017.

17    Minutes after leaving the CSP, Townsend attempted to rob a nearby convenience store

18    using a demand note and claiming that he had a gun.  When he was unsuccessful, he walked about

19    a mile to a 7-Eleven store, which he robbed using the same demand note.  He obtained

20    approximately $100 from the 7-Eleven store, which he used to buy heroin.  Townsend was

21    arrested at about 12:00 p.m. on February 14, 2017.  When questioned by a Santa Cruz Police

22    Department detective, Townsend admitted to the robberies, stated that he had written the demand

23    note while at the CSP, and said that he had used the robbery proceeds to buy heroin, which he had

24    ingested.

25    Townsend was booked into the Jail at approximately 3:30 p.m. on February 14, 2017.

26    Officer Uva, the jail intake officer, completed a Booking Premedical Assessment form.  Townsend

27    denied wanting to hurt himself, denied drug or alcohol use that would cause withdrawal issues,

28    and denied prior or current thoughts of suicide.  Uva found Townsend to be alert and oriented, and

3

did not see signs that Townsend was under the influence of drugs or alcohol.  During a pat search, another officer found that Townsend was wearing a medical bracelet from Dominican Hospital. Townsend stated that he had gone to Dominican claiming to be suicidal, but that he had not actually been suicidal and just wanted a place to spend the night.  Dr. Malka Friedman, a psychologist retained by the County to perform risk assessment and crisis intervention at the Jail, happened to be in the booking area.  Friedman conducted a brief mental health risk assessment – video shows that she spoke to Townsend for less than a minute – during which Townsend was cooperative and denied suicidal ideation.  Friedman determined that Townsend did not meet the criteria for safety-cell housing and otherwise left his housing classification to custodial staff.

Townsend thereafter underwent an intake health screening performed by Hannah Miller, R.N., an employee of CFMG.  CFMG provides medical care to inmates held at the Jail pursuant to a contract with the County.  That contract does not cover mental health care, which is provided to Jail inmates by the County.  Townsend denied having a history of drug or alcohol use.  His vital signs were within normal limits and did not indicate that he was under the influence of drugs or alcohol.  Townsend also denied suicidal ideation.  However, Miller charted Townsend's hospitalization the prior day for suicidal ideation and referred him for a mental health evaluation.

Officer Larkin conducted Townsend's housing classification interview.  Townsend told Larkin that he had been treated for past suicidal issues, but he denied any present suicidal ideation. He requested that he be placed in protective custody and Restricted to Cell ("RTC") housing, stating that he did not want trouble with other inmates.  Jail records reflected that Townsend had not previously been placed in a safety cell.  Larkin classified Townsend as an administrative segregation, protective custody inmate and placed him on RTC.  Larkin assigned Townsend to B Unit cell 23, and he was taken there in the early morning hours of February 15, 2017.  Later in the morning, jail personnel performed an administrative segregation check on Townsend in his cell. Classification Officer Reed completed Townsend's classification form and did not make any changes to his housing assignment.

At approximately 11:10 a.m. on February 15, 2017, Officers Ward and Gomez entered the B Unit to facilitate Townsend's daily one hour out of his cell.  Shortly thereafter, Officer Flores

1   arrived to relieve Ward and Gomez for their lunch break.  Flores escorted Townsend to the B Unit

2   Patio area and secured him there before escorting another inmate out of B Unit for a professional

3   visit.  About ten minutes later, Townsend knocked on the B Unit Patio door, indicating that he

4   wanted to go into the B Unit dayroom.  Central Control opened the door remotely.  Within

5   minutes of entering the dayroom, Townsend went to his cell, apparently to retrieve his mattress

6   cover, and used the mattress cover to hang himself from the bottom railing of B Unit's mezzanine.

7   At about 11:40 a.m., another inmate saw Townsend hanging and banged on his cell door to get an

8   officer's attention.  At about 11:45 a.m., Ward walked into the B Unit to investigate the noise and

9   saw Townsend hanging.  Ward called for a medical response and lifted Townsend up from the legs

10  to relieve pressure on his neck.  Officers cut Townsend down and medical staff resuscitated him.

11  His life was saved, but he suffered severe brain injury.

12        Townsend, through his Guardian ad Litem, filed the complaint in this action on February 5,

13  2019, and the operative first amended complaint ("FAC") on June 18, 2019.  He asserts two

14  claims against Telecare, CFMG, and the County:  (1) a § 1983[3] claim for deprivation of the rights

15  to constitutionally adequate medical and mental health care as guaranteed by the Fourteenth

16  Amendment[4]; and (2) a claim for disability discrimination in violation of the Americans with

17  Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973.

## II.   LEGAL STANDARD

19        "A party is entitled to summary judgment if the 'movant shows that there is no genuine

20  dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of*

21  *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

22  P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue

23  of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

24  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Where the non-moving party bears the burden of

---

26  [3] 42 U.S.C. § 1983.

27  [4] The FAC also appears to assert a § 1983 claim for violation of the right to be free from
    unreasonable seizure as guaranteed by the Fourth Amendment.  *See* FAC ¶ 73.  However,

28  Townsend clarified in his briefing and during oral argument that his § 1983 claim is brought under
    the Fourteenth Amendment only.

United States District Court
Northern District of California

1  proof at trial, the moving party need only prove that there is an absence of evidence to support the

2  non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts

3  to the non-moving party to designate specific facts demonstrating the existence of genuine issues

4  for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could

5  reasonably render a verdict in the non-moving party's favor." *Id.* "The court must view the

6  evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

7  nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole

8  could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

9  trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

10  (1986)).

## III.   DISCUSSION

12        Each of the Defendants seeks summary judgment on Townsend's § 1983 claim (Claim 1)

13  and disability discrimination claim (Claim 2).  The Court discusses the legal standards applicable

14  to each claim before turning to Defendants' motions.

### A.   Section 1983

16        "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a

17  right secured by the Constitution or laws of the United States was violated, and (2) that the alleged

18  violation was committed by a person acting under the color of State law." *Long v. Cty. of Los*

19  *Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

20        With respect to the first element, Townsend asserts violation of the rights to adequate

21  medical and mental health care while in state custody.  "Individuals in state custody have a

22  constitutional right to adequate medical treatment." *Sandoval v. Cty. of San Diego*, 985 F.3d 657,

23  667 (9th Cir. 2021).  For pretrial detainees, that right arises under the Fourteenth Amendment's

24  Due Process Clause.  *See id.*  "Similarly here, the State has a Fourteenth Amendment obligation

25  toward those whom it has ordered involuntarily committed." *Rawson v. Recovery Innovations,*

26  *Inc.*, 975 F.3d 742, 753 (9th Cir. 2020) (finding that just as the State has an Eighth Amendment

27  obligation to provide adequate medical care to those it has incarcerated, so too does the State have

28  a similar Fourteenth Amendment obligation toward those it has ordered involuntarily committed).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  With respect to the second element, Townsend does not assert constitutional claims against

2  any individuals.  He sues only the entities that provided his medical and mental health care at the

3  CSP and the Jail.  "The Supreme Court in *Monell* held that municipalities may only be held liable

4  under section 1983 for constitutional violations resulting from official county policy or custom."

5  *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell v. Dep't of*

6  *Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978)).[5]  "[P]olicies can include written

7  policies, unwritten customs and practices, [or] failure to train municipal employees on avoiding

8  certain obvious constitutional violations."  *Benavidez*, 993 F.3d at 1153.  "Under *Monell v.*

9  *Department of Social Services*, the [municipality] can be liable under § 1983 if its 'policy or

10  custom' caused [the detainee's] injuries through deliberate indifference to his constitutional right

11  to adequate medical care."  *Sandoval*, 985 F.3d at 681.

12  To impose *Monell* liability on the entity defendants in this case, Townsend "must prove:

13  (1) [he] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3)

14  the policy amounts to deliberate indifference to his constitutional right; and (4) the policy is the

15  moving force behind the constitutional violation."  *Gordon v. Cty. of Orange*, 6 F.4th 961, 973

16  (9th Cir. 2021) (quotation marks and citation omitted).

17  **B.    ADA and Section 504 of the Rehabilitation Act**

18  "Congress passed the ADA, 42 U.S.C. § 12101 *et seq.*, in 1990 'to provide clear, strong,

19  consistent, enforceable standards addressing discrimination against individuals with disabilities.'"

20  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007) (quoting 42 U.S.C. § 12101(b)(2)).

21  "Title II of the ADA prohibits public entities from discriminating on the basis of disability."

22  *Payan v. Los Angeles Cmty. Coll. Dist.*, --- F.4th ----, 2021 WL 3730692, at *7 (9th Cir. Aug. 24,

23  2021) (citing 42 U.S.C. § 12132).  Section 504 of the Rehabilitation Act "similarly prohibits

24  disability discrimination by recipients of federal funds."  *Payan*, 2021 WL 3730692, at *7.  "The

25  two laws are interpreted coextensively because there is no significant difference in the analysis of

26

27  ─────────────────────────

28  [5] The Court initially understood from Townsend's briefing that he was pursuing a theory of "direct liability," as distinct from *Monell* liability, against the entity Defendants.  Townsend's counsel clarified during oral argument that all of Townsend's § 1983 claims are brought under *Monell*.

rights and obligations created by the two Acts." *Id.* (quotation marks and citation omitted). The elements of a claim under Title II are as follows: (1) [the plaintiff] is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Id.* (quotation marks and citation omitted). The elements of a Section 504 claim are similar, with the added requirement that the program receives federal financial assistance. *See id.*

Title III of the ADA applies to private entities that own, lease, or operate a place of public accommodation. *See Molski*, 481 F.3d at 730. "To prevail on a Title III discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability." *Id.*

### C.   Telecare's Motion

Townsend's claims against Telecare arise from the evaluation and care he received during his 5150 hold at the CSP.

#### 1.   Claim 1 – § 1983

Townsend claims that he was deprived of the Fourteenth Amendment right to adequate mental health care when he was released from the 5150 hold without a psychiatric consultation, in violation of Telecare's own written policy and the professional standard of care in California. Townsend asserts that this constitutional deprivation was caused by the CSP staff's practice of releasing 5150 holds based on evaluations performed by lower level staff such as registered nurses and family therapists, without consulting a psychiatrist, and by Telecare's failure to train its staff regarding its written policy that a psychiatric consultation is required to release a 5150 hold. Finally, Townsend argues that had a psychiatrist been consulted, he would not have been released while in a suicidal frame of mind, but would have been transferred to the PHF or other inpatient facility.

Telecare argues that it is entitled to summary judgment on Townsend's § 1983 claim because it is a private corporation and not a state actor, and because Townsend cannot establish a

United States District Court
Northern District of California

1   constitutional violation arising out of the evaluation and care he received in connection with the

2   5150 hold.  In opposition, Townsend contends that Telecare is a state actor with respect to its

3   operation of the CSP, and that there are genuine issues of material fact as to whether Townsend

4   suffered a constitutional deprivation attributable to Telecare.  In reply, Telecare asks that if the

5   Court denies summary judgment on the § 1983 claim, it apply the 1975 Medical Injury

6   Compensation Reform Act ("MICRA") cap on the damages that can be awarded against it.

7       At the hearing, Townsend's counsel requested that the Court use its inherent power to

8   grant partial summary judgment for Townsend on the state actor question even though Townsend

9   did not file an affirmative summary judgment motion.  The Court requested and received

10  supplemental briefing on the scope of its inherent power to grant Townsend's request.

### a.   State Actor

12      "Pursuant to § 1983, a defendant may be liable for violating a plaintiff's constitutional

13  rights only if the defendant committed the alleged deprivation while acting under color of state

14  law." *Rawson*, 975 F.3d at 747.  "The determination of whether a nominally private person or

15  corporation acts under color of state law is a matter of normative judgment, and the criteria lack

16  rigid simplicity." *Id.* (quotation marks and citation omitted).  The Ninth Circuit has "recognized at

17  least four different general tests that may aid . . . in identifying state action: (1) public function; (2)

18  joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Id*.

19  (quotation marks and citation omitted).  In *Rawson*, the Ninth Circuit questioned "[w]hether these

20  different tests are actually different in operation or simply different ways of characterizing the

21  necessarily fact-bound inquiry that confronts the Court" when a § 1983 claim is brought against a

22  private person or corporation, but it found that the issue "need not be resolved." *Id*.  "Satisfaction

23  of any one test is sufficient to find state action, so long as no countervailing factor exists." *Id*.

24  (quotation marks and citation omitted).

25      Townsend argues only the governmental nexus text.  Accordingly, the Court limits its

26  discussion to that test.  The Ninth Circuit has described the governmental nexus test as follows:

27  "In order to be considered state action, when a private actor participates in a governmental act, the

28  court must find a sufficiently close nexus between the state and the private actor so that the action

United States District Court
Northern District of California

9

of the latter may be fairly treated as that of the State itself." *Jensen v. Lane Cty.*, 222 F.3d 570, 575 (9th Cir. 2000) (quotation marks and citation omitted). "[D]etailed regulation of and substantial funding for private actors are not sufficient to transform the party's conduct into state action." *Id.* "[T]he 'State [must be] so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" *Id.* (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357-58 (1974)).

Telecare argues that on this record, the only connections between it and the County are that Telecare operates the CSP pursuant to a contract with the County, the County has identified the CSP as the designated receiving facility in the County for persons who are placed on a 5150 hold, and Telecare leases the CSP facilities from the County. Telecare cites decisions of district courts within the Ninth Circuit holding that a county's designation of a private hospital as a receiving facility for persons on 5150 holds is not sufficient to meet the governmental nexus test. *See Walsh v. AMD Sacramento*, No. 2:13-CV-2077 MCE KJN, 2014 WL 4472752, at *11 (E.D. Cal. Sept. 11, 2014), *report and recommendation adopted* (Dec. 29, 2014), *aff'd sub nom. Walsh v. Am. Med. Response*, 684 F. App'x 610 (9th Cir. 2017) (action by a private party pursuant to a state statute is insufficient, standing alone, to render that party a state actor); *Sturm v. El Camino Hosp.*, No. C09-02324 RMW, 2010 WL 725563, at *4 (N.D. Cal. Feb. 26, 2010) ("[T]hat the county government designated the hospital as a facility that may hold individuals for 72-hour treatment and evaluation and likely designated the nurse as an individual qualified to make the probable cause finding" was insufficient to render the hospital a state actor). When the nonmoving party has the burden of proof at trial, the moving party may meet its initial burden on summary judgment by pointing to an absence of evidence in the record. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387. The Court thus finds that Telecare has met its initial burden by pointing to an absence of evidence showing a close nexus between it and the County. The burden therefore shifts to Townsend to demonstrate a genuine issue of fact.

Townsend directs the Court to the contract between the County and Telecare for operation of the CSP and the PHF. *See* Scruggs Decl. Exh. 1 at TC 000428, ECF 97. The contract provides that Telecare, identified as "Contractor," "shall be responsible to comply with the requirements of

United States District Court
Northern District of California

the Santa Cruz County Mental Health Plan (SCMHP) and shall complete and submit supporting documentation for all admissions." *Id*. at TC 000436.  Telecare also must "enter all Client Service Information, admission data, and billing information into an approved County data system." *Id*. Telecare is responsible for mandated reporting of patient information, admission and discharge data, and other required reports to the Office of Statewide Health Planning and Development. *Id*. Under the contract, Telecare must notify the County "of any admission of a County individual within 24 hours or the next business day" in a manner approved by the County. *Id*. at TC 000441 ¶ 18.  Telecare must log all grievances and their dispositions, and must provide summaries of the grievance log entries to the County at monthly intervals. *Id*. ¶ 20.  Telecare must notify the County "of all incidents or unusual occurrences reportable to state licensing bodies that affect County Individuals within twenty-four (24) hours." *Id*. at TC 000442 ¶ 20.

In addition to the above, the contract provides that Telecare "shall work collaboratively with COUNTY HSA employees and shall function as a key service element in the continuum of care for mental health service in the County." *Id*. at TC 000443 ¶ 30.  The County has the right "to participate in the selection process of key management positions" and to "review[] the selection process of key management staff on an on-going basis. *Id*.  The County also has the right to audit Telecare's financial records and other data. *Id*. at TC 000444.  The contract provides that Telecare "shall develop and implement a Cultural Competency Plan in conjunction with COUNTY," and pursuant to such plan must ensure that all staff receive ongoing training on cultural competency. *Id*. at TC 00045.

Townsend argues persuasively that these contractual provisions demonstrate that the County is far more involved in the operation of the CSP and PHF than is suggested by Telecare. Given the County's oversight with respect to selection of key management positions, joint development of a cultural competency training plan, and similar aspects of the contract, the Court finds that there is at least a genuine dispute as to whether Telecare is a state actor under the governmental nexus test.  The Court has no trouble concluding that a jury could determine that "the state has so deeply insinuated itself" into the process of operating the CSP that Telecare must be considered at state actor. *See Jensen*, 222 F.3d at 575.

United States District Court
Northern District of California

At the hearing, Townsend's counsel suggested that the Court could grant partial summary judgment in Townsend's favor on the state actor issue, despite the fact that Townsend did not file a motion seeking affirmative relief.  Counsel cited the case *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982), in which the Ninth Circuit held that "the court may *sua sponte* grant summary judgment to the non-moving party" in certain circumstances.  Those circumstances exist when "it is made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact essential to the proof of movant's case and that the case cannot be proved if a trial should be held."  *Id.*  In addition, the moving party against whom *sua sponte* summary judgment is contemplated must be afforded "a full and fair opportunity to ventilate the issues involved in the motion."  *Id.* at 312.  The Court requested supplemental briefing on a potential exercise of the Court's inherent power under *Cool Fuel.*

While it is satisfied that it has the authority to grant Townsend's request for entry of partial summary judgment in his favor, the Court declines to exercise that authority here.  Whether the defendant acted under color of state law is an element of a § 1983 claim that normally must be proved to the jury by a preponderance of the evidence.  *See* Ninth Circuit Model Civ. Jury Instructions 9.3, 9.5.  The Ninth Circuit has characterized the question of whether a private corporation is a state actor for § 1983 purposes as a "necessarily fact-bound inquiry."  *Rawson*, 975 F.3d at 747.  In *Rawson*, the Ninth Circuit resolved that factual inquiry in the context of the appeal, choosing to go beyond merely vacating the district court's grant of summary judgment for the defendant, and making an affirmative finding "that a sufficiently close nexus between the state and the private actor existed" such "that the action of the latter may be fairly treated as that of the State itself."  *Rawson*, 975 F.3d at 757 (quotation marks and citation omitted).  The Ninth Circuit did the same in *Jensen*.  *See Jensen*, 222 F.3d at 575-76 ("[U]nder the close nexus/joint action test, we hold that Dr. Robbins' conduct constituted state action.").  In this case, however, the Court is not persuaded that the contract between Telecare and the County establishes the requisite close nexus as a matter of law, such that no reasonable jury could find for Telecare on the issue.  While it is the Court's opinion that Townsend's showing on governmental nexus is strong, the Court will leave it to the jury to decide whether the state actor requirement is met with respect to Telecare.

1    Accordingly, Telecare's motion for summary judgment as to Claim 1 on the basis that it is

2    not a state actor is DENIED.

3                              **b.    Constitutional Violation**

4    Under the authorities discussed above, Townsend must prove the following elements in

5    order to prevail on his § 1983 claim against Telecare:  (1) he had a constitutional right of which he

6    was deprived; (2) Telecare had a policy; (3) the policy amounted to deliberate indifference to his

7    constitutional right; and (4) the policy was the moving force behind the constitutional violation.

8    *See Gordon*, 6 F.4th at 973.

9                   **i.    Constitutional Right of Which He was Deprived**

10   Townsend asserts that his § 5150 hold gave rise to a Fourteenth Amendment right to

11   adequate mental health care, and that he was deprived of that right when he was released from the

12   5150 hold without a psychiatric consultation.  Townsend characterizes his release based on the

13   consensus of lower-level CSP medical staff as a failure to exercise "professional judgment" in

14   violation of his Fourteenth Amendment rights as described by the Supreme Court in *Youngberg v.*

15   *Romeo*.  *See Youngberg v. Romeo,* 457 U.S. 307, 321 (1982).

16   Telecare relies on *Cotton v. Cty. of Santa Barbara* for the proposition that § 5150 does not

17   create a liberty interest, and thus release from a § 5150 hold cannot amount to a constitutional

18   violation.  *See Cotton v. Cty. of Santa Barbara*, No. CV 03-7652 PSG (RZX), 2010 WL 11508619

19   (C.D. Cal. Apr. 19, 2010), *aff'd sub nom. Cotton v. Martinez*, 475 F. App'x 207 (9th Cir. 2012).

20   In that case, Russell Cotton was placed on a 5150 hold, but while officers were transporting him to

21   the Santa Barbara Psychiatric Health Facility ("PHF"), he kicked out a window of the vehicle.  *See*

22   *id.* at *1.  The PHF staff informed the officers that they could not accommodate Cotton, so the

23   officers arrested him and took him to the Santa Barbara County Jail.  *See id.*  The officers

24   allegedly used force to subdue Cotton and then left him alone in a cell despite his complaints that

25   he could not breathe.  *See id.*  Cotton died, and his wife and daughters filed suit against the County

26   of Santa Barbara and others, alleging among other things that defendants acted with deliberate

27   indifference to Cotton's medical needs.  *See id.*  The district court granted the defendants' motion

28   *in limine* to exclude evidence that the defendants violated § 5150, holding that § 5150 did not

United States District Court
Northern District of California

13

create a liberty interest in being involuntarily committed.  *Id*. at \*3.  The district court concluded that "[b]ecause § 5150 did not create a constitutionally protected interest in being transferred to a psychiatric facility, evidence of any violation of § 5150 would be irrelevant to establishing a due process violation."  *Id*.

*Cotton* is both factually and legally distinguishable from the present case.  In *Cotton*, the plaintiffs' decedent was never actually transported to a psychiatric facility and evaluated pursuant to § 5150.  The Cotton court understood the plaintiffs to be asserting that § 5150 creates a constitutional right to be involuntarily committed, and it found that § 5150 does not give rise to such a right.  In contrast, Townsend was transported to a psychiatric facility, where he was held and evaluated for thirty-four hours pursuant to § 5150.  Townsend's assertion is not that he had a constitutional right to be involuntarily committed, but rather that once he was placed on an involuntary hold, he had a constitutional right to adequate mental health care.  Accordingly, *Cotton* is not applicable here.

The cases cited by Townsend support his position that an individual who is placed on a 5150 hold has a constitutional right to adequate mental health care while subject to an involuntary hold.  In *Youngberg*, the Supreme Court held that developmentally disabled individuals who are committed to a state institution have Fourteenth Amendment rights to "adequate food, shelter, clothing, and medical care," as well as "safety, freedom of movement, and training."  *Youngberg*, 457 U.S. at 315-18.  The Ninth Circuit has applied *Youngberg* to conclude that mentally incapacitated criminal defendants have Fourteenth Amendment rights in "freedom from incarceration and in restorative treatment," meaning "mental health treatment that gives them a realistic opportunity to be cured or improve the mental condition for which they were confined."  *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (quotation marks and citation omitted).  Finally, while addressing an Oregon state statute authorizing involuntary commitment of individuals for evaluation and treatment, the Ninth Circuit recognized that "the State has an Eighth Amendment obligation to provide adequate medical care to those whom it has incarcerated," and similarly "has a Fourteenth Amendment obligation toward those whom it has ordered involuntarily committed."  *Rawson*, 975 F.3d at 753.  This Court finds that under the

14

1    reasoning of these authorities, Townsend had a Fourteenth Amendment right to adequate mental

2    health care once he was placed on the 5150 hold and throughout its duration.

3        Townsend asserts that he was deprived of the right to adequate mental health care when he

4    was released from the 5150 hold based on the concurrence of Nurse Ferguson and MFT Morel,

5    without consultation with a psychiatrist.  Townsend claims that a psychiatric consultation is

6    required for release of a 5150 hold under both CSP's written policy and the standard of care in

7    California.  Telecare contends that Townsend's claim amounts to nothing more than a claim of

8    negligence, which is insufficient to give rise to a constitutional violation.  *See Toguchi v. Chung*,

9    391 F.3d 1051, 1060 (9th Cir. 2004) ("[L]iability for negligently inflicted harm is categorically

10   beneath the threshold of constitutional due process." (quotation marks and citation omitted)).  In

11   response, Townsend argues that in the context of involuntary commitment, a constitutional

12   violation may be established if the state official does not exercise "professional judgment."  *See*

13   *Ammons v. Washington Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011).

14       Townsend is correct.  In the involuntary commitment context, "the Constitution requires

15   that hospital officials, in order to protect a patient's right to safe conditions, exercise professional

16   judgment."  *Ammons*, 648 F.3d at 1027 (citing *Youngberg*, 457 U.S. at 321-22).  "[L]iability may

17   be imposed for failure to provide safe conditions 'when the decision made by the professional is

18   such a substantial departure from accepted professional judgment, practice, or standards as to

19   demonstrate that the person responsible actually did not base the decision on such a judgment.'"

20   *Ammons*, 648 F.3d at 1027 (quoting *Youngberg*, 457 U.S. at 323).  The Ninth Circuit has referred

21   to this standard as the "*Youngberg* professional judgment standard."  *Ammons*, 648 F.3d at 1027.

22   This standard is distinct from the "deliberate indifference" standard used in Eighth Amendment

23   cruel and unusual punishment cases.  *See id.*

24       Many of the cases applying *Youngberg* address the right of involuntarily committed

25   individuals to "safe conditions," which is slightly different than the right to adequate mental

26   health care asserted here.  However, in *Mink*, the Ninth Circuit expressly recognized the Fourteenth

27   Amendment right of mentally incapacitated criminal defendants to "mental health treatment that

28   gives them a realistic opportunity to be cured or improve the mental condition for which they were

United States District Court
Northern District of California

United States District Court
Northern District of California

confined." *Mink*, 322 F.3d at 1121 (quotation marks and citation omitted).  Moreover, in the jail context "the Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure-to-protect claims." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018).  Accordingly, the Court concludes that the *Youngberg* professional judgment standard applies when evaluating Townsend's assertion that he was deprived of the constitutional right to adequate mental health care during the 5150 hold.  The Court emphasizes, however, that even if Townsend can establish a violation of his constitutional rights under the *Youngberg* professional judgment standard, he cannot prevail on his claim against Telecare unless he *also* establishes that a Telecare policy was the "moving force" behind the violation *and* that the Telecare policy amounted to "deliberate indifference" to his constitutional rights.  *See Gordon*, 6 F.4th at 973.  The latter elements of *Monell* liability are discussed separately, below.

Telecare contends that Townsend cannot establish the asserted constitutional violation, because licensed mental health professionals at the CSP released the 5150 hold.  Telecare points to its Policy 1.4.4.1, dated January 14, 2014 and titled "Release of 5150 Holds."  *See* Vitacolonna Decl. Exh. M, ECF 91-1.  That policy provides that a 5150 hold may be released by either a Licensed Psychologist or a Psychiatrist, or by two concurring Licensed Mental Health Professionals.  *See id.*  The latter category includes individuals licensed in nursing social work, marriage and family counseling.  A Licensed Mental Health Professional "may be of a variety of disciplines, e.g. Social Work, Psychology, MFT, Nursing, Psychiatry, etc."  *Id.*  "In cases where a Psychiatrist has chosen to continue a hold, only a Psychiatrist will be able to, after his/her evaluation, discontinue that hold."  *Id.*  It is undisputed that two Licensed Mental Health Professionals, RN Ferguson and MFT Morel, concurred in the decision to release Townsend from the 5150 hold as required under Policy 1.4.4.1.  Telecare also submits the declaration of its medical expert, Marc A. Cohen, M.D., M.S., who states that the decision of RN Ferguson and MFT Morel was within the applicable standard of care.  *See* Vitacolonna Decl. Exh. T at 61-62, ECF 91-2.  This evidence is sufficient to meet Telecare's initial burden of proving that no constitutional violation occurred at the CSP.  The burden thus shifts to Townsend to present

1    evidence from which a jury could find that a constitutional violation did occur.

2            Townsend directs the Court to Telecare's Policy 2.1.7, dated July 1, 2014 and titled

3    "Psychiatry Services."  *See* Scruggs Decl. Exh. 1 at TC 000888-000889, ECF 97.  That policy

4    provides that "[a] psychiatrist is available to the CSP 24 hours a day, 7 days a week" by phone

5    "for staff consultation."  *Id*.  The policy provides further that "[s]taff *shall consult with the*

6    *psychiatrist* in the following cases . . . When mental health staff believe a client should be released

7    from a legal hold."  *Id*. (emphasis added).  Townsend also cites to Telecare's Policy 2.2.1a, dated

8    January 31, 2017 and titled "Clients Referred to CSP Following Behavioral Interventions."  *See*

9    Scruggs Decl. Exh. 1 at TC 000575, ECF 97.  The policy establishes certain procedures that must

10   be followed "[w]henever a client who has experienced a behavioral intervention by an outside

11   provider, Emergency Department, and/or law enforcement (i.e. restraints, tazing, rubber bullets,

12   SWAT) is referred to the CSP."  *Id*.  Under those circumstances, "[i]f CSP Assessments fail to

13   demonstrate that the client currently meets criteria for a legal hold OR that the client does not meet

14   Medical Necessity for Inpatient Treatment, staff *will consult with the Psychiatrist On Call prior to*

15   *releasing the client*."  *Id*. (emphasis added).

16           Townsend submits the opinions of his medical experts, Richard Hayward, Ph.D., and Scott

17   Eliason, M.D., both of whom state that release of a 5150 hold without consultation with a

18   psychiatrist or clinical psychologist falls below the standard of care in California.  *See* Scruggs

19   Decl. Exh. 12 at 6-7, ECF 97; Scruggs Decl. Exh. 13 at 10, ECF 97.  Drs. Hayward and Eliason

20   also opine that had a psychiatrist been consulted, such psychiatrist would not (if acting within the

21   standard of care) have released Townsend from the 5150 hold without further care.  *See* Scruggs

22   Decl. Exh. 12 at 8; Exh. 13 at 11.  Finally, Townsend provides the deposition testimony of

23   Telecare's Chief Medical Officer, Kurt Eller, M.D., who conceded that Policy 2.1.7 applied to the

24   Santa Cruz County CSP in February 2017, when the 5150 hold at issue in this case occurred.  *See*

25   Scruggs Decl. Exh. 4 at 16:11-15, ECF 97.  Eller also testified that Policy 2.2.1a was created for

26   the Santa Cruz County CSP and remains in effect.  *See id*. at 11:16-13:16.

27           Based on Townsend's evidence, a reasonable jury could find that the standard of care

28   required a psychiatric consultation before he was released from the 5150 hold, and that the release

United States District Court
Northern District of California

based solely on the concurrence of an RN and a MFT was "such a substantial departure from accepted professional judgment, practice, or standards" as to rise to the level of a constitutional violation under the *Youngberg* professional judgment standard.  *Ammons*, 648 F.3d at 1027 (quoting *Youngberg*, 457 U.S. at 323).

### ii.     Telecare Policies and Practices

In order to hold Telecare liable for the asserted constitutional violation, Townsend must show that the CSP staff's conduct was pursuant to one or more Telecare policies.  "[P]olicies can include written policies, unwritten customs and practices, [or] failure to train municipal employees on avoiding certain obvious constitutional violations."  *Benavidez*, 993 F.3d at 1153.  Townsend asserts that it was the staff's established practice to release a 5150 hold based on evaluations performed by lower level staff such as registered nurses and family therapists, without consultation with a psychiatrist.  He also asserts that Telecare failed to train staff regarding its own written policies requiring a psychiatric consultation before release of a 5150 hold.  Telecare does not deny that its staff's practice was to release a 5150 hold based on the concurrence of two licensed professionals who were not psychiatrists.  Nor does Telecare deny that it failed to train its staff that a psychiatric consultation was required for release of a 5150 hold.

### iii.    Deliberate Indifference

Next, the Court addresses whether the record evidence would support a finding that these practices amounted to objective deliberate indifference to the constitutional rights of persons brought to CSP on 5150 holds.  To establish the objective deliberate indifference necessary to impose liability under *Monell*, Townsend must show that Telecare "had actual or constructive knowledge that its practices were substantially certain to cause a constitutional violation."  *Sandoval*, 985 F.3d at 682.  "This standard does not require proof of a prior injury."  *Id*.  "A constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur."  *Id*.  If this were not the case, every municipal defendant would get one "free pass" for unconstitutional policies or practices.  *See id*.

The Court finds that a jury could infer from Telecare's written policies 2.1.7 and 2.2.1a that Telecare was aware of the importance of ensuring that CSP staff obtained a psychiatric

1    consultation before releasing an individual from a 5150 hold.  *See Sandoval*, 985 F.3d at 683 ("a

2    jury could infer from the more rigorous policies the County put in place for the sobering and

3    safety cells that it was aware of the importance of ensuring that the nursing staff knew which

4    inmates required medical treatment or observation.").  The Court finds it significant that of the

5    three policies addressing release of a 5150 hold, the two more recent policies require a psychiatric

6    consultation prior to release.  Telecare's Chief Medical Officer was aware of the policies requiring

7    a psychiatric consultation and acknowledged their applicability to the Santa Cruz County CSP.

8    On this record, a jury reasonably could find that the CSP staff's practice of releasing 5150 holds

9    without a psychiatric consultation, and Telecare's failure to train CSP staff regarding Telecare's

10   written policies that required a psychiatric consultation for release of a 5150 hold, go beyond mere

11   negligence and constitute deliberate indifference to the serious mental health needs of individuals

12   placed on 5150 holds.

13                              **iv.      Moving Force**

14          Finally, the Court addresses whether the evidence would support a finding that Telecare's

15   practices were the "moving force" behind the asserted constitutional violation.  To establish that a

16   policy or practice is the "moving force" behind a constitutional violation, a plaintiff must

17   demonstrate a "direct causal link" between the policy or practice and the constitutional

18   deprivation.  *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

19   The Ninth Circuit has characterized this question as "whether there is a 'direct causal link'

20   between the [municipality's] practice" and "[plaintiff's] injuries."  *See* Sandoval, 985 F.3d at 681

21   (9th Cir. 2021).

22          It is undisputed that Nurse Ferguson and MFT Morel followed established CSP practice

23   when releasing Townsend from the 5150 based on the concurrence of two health care

24   professionals below the level of psychiatrist.  Townsend submits the deposition testimony of

25   Nurse Ferguson and MFT Morel, showing that neither was aware of the written Telecare policies

26   requiring a psychiatric consult before release of a 5150 hold.  *See* Scruggs Exh. 2 at 63:20-65:7;

27   Exh. 3 at 83:24-85:15, 89:15-90:4.  Under these circumstances, a jury could find that the staff's

28   practice of releasing 5150 holds without a psychiatric consultation, and Telecare's failure to train

United States District Court
Northern District of California

19

1    that a psychiatric consultation is required, were the moving forces behind the asserted

2    constitutional violation.  A jury also could find that had a psychiatric consultation been obtained,

3    Townsend would not have been released on February 14, 2017, but would have been transferred to

4    the PHF or other inpatient facility, and thus would not have ended up at the Jail where he hanged

5    himself.

6         Accordingly, Telecare's motion for summary judgment on Claim 1 is DENIED.

7                              **c.      MICRA**

8         In its reply brief, Telecare argues for the first time that if the Court does not grant its

9    summary judgment motion on Claim 1, the Court should make a finding that the damages cap

10   imposed by the 1975 Medical Injury Compensation Reform Act ("MICRA") applies.  *See* Cal.

11   Civ. Code § 3333.2.  "Civil Code section 3333.2 was enacted as part of the 1975 Medical Injury

12   Compensation Reform Act (MICRA), to reduce the costs of liability insurance for health care

13   providers." *Barris v. Cty. of Los Angeles*, 20 Cal. 4th 101, 108 (1999).  The statute provides that

14   "[i]n any action for injury against a health care provider based on professional negligence," the

15   amount of damages for noneconomic losses may not exceed $250,000.

16        Telecare's request is not well-taken.  As an initial matter, the Court will not consider an

17   issue raised for the first time in a reply brief filed in support of summary judgment.  This is

18   particularly true where a ruling in Telecare's favor would have a significant impact on

19   Townsend's case, and Townsend had no opportunity to brief the issue.  Moreover, Townsend's

20   theory is that Telecare's conduct went well beyond professional negligence and rose to the level of

21   a constitutional violation.  Telecare has not cited, and the Court has been unable to locate, any case

22   in which a plaintiff's § 1983 recovery on a *Monell* claim for deliberate indifference to serious

23   medical or mental health issues was limited by MICRA.  The Ninth Circuit recently declined to

24   apply another California state law that would limit damages in § 1983 cases, a statutory provision

25   that "forbids recovery for a decedent's loss of life." *Valenzuela v. City of Anaheim*, 6 F.4th 1098,

26   1101 (9th Cir. 2021) (citing Cal. Civ. Proc. Code § 377.34).  The Ninth Circuit held that

27   "[p]rohibiting loss of life damages would run afoul of § 1983's remedial purpose." *Id*. at 1103.  In

28   this Court's view, capping damages on a claim for deliberate indifference to serious medical or

1    mental health issues likewise would run afoul of the purpose of § 1983.

2         Telecare's request that the Court find the MICRA cap applicable to Townsend's § 1983

3    claim is DENIED.

4                        **2.    Claim 2 - ADA**

5         With respect to Claim 2, asserted under Title III of the ADA, Townsend claims that

6    Telecare discriminated against him on the basis of his severe mental disability, and failed to

7    accommodate his severe mental disability, when it released the 5150 hold rather than admitting

8    him to the PHF for longer term care.  The FAC makes clear that Townsend's ADA claim against

9    Telecare is asserted under Title III.  *See* FAC ¶¶ 82 ("Telecare and CFMG therefore operate places

10   of public accommodation and are subject to Title III of the ADA.").  "To prevail on a Title III

11   discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the

12   ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public

13   accommodation; and (3) the plaintiff was denied public accommodations by the defendant because

14   of her disability."  *See Molski*, 481 F.3d at 730.

15        For purposes of this motion, Telecare does not dispute that Townsend has a mental

16   disability or that Telecare is a private entity that operates a place of public accommodation.

17   However, Telecare asserts that the record is devoid of evidence that Townsend was denied access

18   to its services *because of his disability.*  To the contrary, Telecare points out that the entire purpose

19   of the CSP is to provide services to people with serious medical and mental health issues and that

20   Townsend in fact was provided services.  Townsend's complaint is that he was released from the

21   5150 hold rather than being transferred to an inpatient facility.  However, Telecare points to an

22   absence in the record that the decision to release Townsend, and thereby deny him inpatient

23   services in another facility, was because of his mental disability.  Telecare also notes that the only

24   remedy available under Title III is injunctive relief, and that Townsend does not seek injunctive

25   relief against Telecare.  *See Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862,

26   867 (9th Cir. 2014) ("Damages are not an available remedy to individuals under Title III of the

27   ADA; individuals may receive only injunctive relief.").  As noted above, the moving party may

28   meet its initial burden on summary judgment by pointing to an absence of evidence in the record.

United States District Court
Northern District of California

1  *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.  The Court finds that Telecare has met its

2  initial burden with respect to Townsend's Title III claim, and thus the burden shifts to Townsend

3  to show the existence of disputed facts that would preclude summary judgment.

4  In his opposition, Townsend asserts for the first time that Telecare is liable under Title II of

5  the ADA rather than under Title III, as is alleged in the FAC.  The Court declines to consider a

6  claim raised for the first time in opposition to summary judgment.  *See Pickern v. Pier 1 Imports*

7  *(U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (district court did not abuse its discretion in

8  refusing to consider new ADA claims raised for first time in opposition to summary judgment).

9  Even if the Court were to consider Townsend's newly asserted Title II claim, however, the

10  analysis would be much the same, as Title II requires the plaintiff to show that the asserted

11  exclusion, denial of benefits, or discrimination was by reason of his disability.  *See Payan*, 2021

12  WL 3730692, at *7.  Townsend has not identified any evidence in the record from which a jury

13  could find that Telecare denied him accommodation because of his mental disability.

14  Townsend's reliance *Atayde v. Napa State Hosp.*, 255 F. Supp. 3d 978 (E.D. Cal. 2017), is

15  misplaced.  In *Atayde*, the question before the district court was whether the plaintiff has pled facts

16  sufficient to state a claim for failure to accommodate under the ADA and Rehabilitation Act.  *See*

17  *id.* at 1003.  The district court held that the plaintiff had alleged sufficient facts to go forward.  In

18  the present case, the Court must determine whether Townsend has identified *evidence* that he was

19  denied public accommodations, or access to benefits, by reason of his disability.  Townsend has

20  not done so.  Instead, he argues in conclusory fashion that he "was arbitrarily excluded from

21  participation in" the PHF.  However, he does not point to any evidence in the record suggesting

22  that the failure to transfer him to the PHF was arbitrary.  To the contrary, the records demonstrate

23  that the CSP staff monitored Townsend throughout his stay and that two of the staff concurred in

24  finding that release was appropriate after 34 hours.  The fact that the release decision was made by

25  lower level staff when arguably the standard of care required a psychiatric consultation does not

26  render the decision "arbitrary," and Townsend cites no case to the contrary.

27  The Court concludes that Telecare is entitled to summary judgment with respect to

28  Townsend's ADA claim against it, whether such claim is brought under Title II or Title III.

22

1   Townsend has abandoned any Rehabilitation Act claim against Telecare by failing to address it in

2   opposition to the motion for summary judgment.

3          Telecare's motion for summary judgment on Claim 2 is GRANTED.

4          **D.      CFMG's Motion**

5          CFMG is a private corporation that provides medical care to inmates held at the Jail

6   pursuant to a contract with the County.  That contract does not cover mental health care, which is

7   provided to Jail inmates by the County.  It appears that Townsend's only interaction with any

8   CFMG employee while at the Jail was the intake health screening performed by Hannah Miller,

9   R.N., an employee of CFMG.

10                  **1.      Claim 1 – § 1983**

11         To prevail on his § 1983 claim against CFMG, Townsend must prove the following

12  elements:  (1) he had a constitutional right of which he was deprived; (2) CFMG had a policy; (3)

13  the policy amounted to deliberate indifference to his constitutional right; and (4) the policy was

14  the moving force behind the constitutional violation.  *See Gordon*, 6 F.4th at 973.

15         Townsend claims that he was deprived of the Fourteenth Amendment right to adequate

16  medical care when Miller took at face value his denial of drug use despite contradictory

17  information in his medical chart showing a long history of drug abuse.  He asserts that this

18  constitutional deprivation was caused by CFMG's custom of accepting an inmate's word

19  regarding drug use, and training to do the same.

20         Unlike Telecare, CFMG does not challenge Townsend's characterization of it as a state

21  actor for purposes of this motion.  However, CFMG argues that it is entitled to summary judgment

22  because "CFMG had no deliberately indifferent policy or practice which is affirmatively linked to

23  his attempted suicide in the jail."  CFMG MSJ at 7, ECF 90.  Parsing this assertion, the Court

24  understands CFMG to be challenging the third and fourth elements of Townsend's *Monell* claim

25  by arguing that there is no record evidence establishing either "objective deliberate indifference on

26  the part of [CFMG]" or a "direct causal link" between CFMG's custom and training and

27  Townsend's injuries.  *See Sandoval*, 985 F.3d at 682.  As discussed above, CFMG may meet its

28  initial burden on summary judgment by pointing to an absence of evidence in the record.  *See In re*

United States District Court
Northern District of California

1    *Oracle Corp. Sec. Litig.*, 627 F.3d at 387.  The Court finds that CFMG has done so here by

2    highlighting the lack of any record evidence showing that CFMG acted with deliberate

3    indifference to the medical health of Jail inmates with respect to its custom and training regarding

4    intake procedures, or that Miller's failure to consider the entirety of Townsend's medical history,

5    rather than taking his word on lack of drug use, caused Townsend's injuries.  The burden thus

6    shifts to Townsend to show that disputed facts preclude summary judgment.

7         Addressing Townsend's argument on causation first, Townsend's reasoning goes as

8    follows:  had Miller considered the entirety of Townsend's medical record instead of taking his

9    denial of drug use at face value, she would have noted his prior opioid abuse and would have

10   initiated a Clinical Opiate Withdrawal Scale ("COWS") assessment.  CFMG has a written policy

11   of initiating a COWS assessment for inmates at risk of opioid withdrawal.  *See* Scruggs Decl. Exh.

12   5, ECF 99.  Townsend asserts that if Miller had initiated a COWS assessment, he would not have

13   been housed in B unit on RTC, but instead would have been housed in O unit.  *See* Scruggs Decl.

14   Exh. 13 at 42:8-22.  Finally, Townsend contends that if he had been housed in O unit, he would

15   have been more closely monitored, and therefore would not have had the opportunity to attempt

16   suicide.

17        The Court finds that speculation as to what would have happened had Miller considered all

18   of the information in Townsend's chart, and then what would have happened after that, and what

19   would have happened after *that* is simply too untethered to the record evidence to give rise to a

20   reasonable inference that the alleged unconstitutional policy at issue caused Townsend's injury.

21   The Court concludes that Townsend has failed to meet its burden of submitting evidence from

22   which a jury could find the required causal link between CFMG's allegedly unconstitutional

23   custom and training and his injuries.  CFMG is entitled to summary judgment on this basis.

24   Having reached that conclusion, the Court need not and does not address CFMG's additional

25   arguments.

26        CFMG's motion for summary judgment on Claim 1 is GRANTED.

27        **2.      Claim 2 - ADA**

28   With respect to Claim 2, Townsend claims that CFMG discriminated against him on the

United States District Court
Northern District of California

United States District Court
Northern District of California

basis of his severe mental disability, and failed to accommodate his severe mental disability. The FAC makes clear that Townsend's ADA claim against CFMG is asserted under Title III. *See* FAC ¶¶ 82 ("Telecare and CFMG therefore operate places of public accommodation and are subject to Title III of the ADA."). In his opposition, Townsend asserts for the first time that CFMG is liable under Title II of the ADA rather than under Title III, as is alleged in the FAC.

CFMG is entitled to summary judgment on Claim 2 for the same reasons discussed above in connection with Telecare. CFMG has met its burden on summary judgment by pointing to an absence of evidence in the record from which a jury could find that CFMG discriminated against Townsend, or failed to accommodate him, on the basis of his disability. Townsend has not identified any evidence in the record from which a jury could find for Townsend on this point. Townsend has abandoned any Rehabilitation Act claim against CFMG by failing to address it in opposition to the motion for summary judgment.

CFMG's motion for summary judgment on Claim 2 is GRANTED.

**E.      County's Motion**

**1.      Claim 1 – § 1983**

Townsend asserts two bases for § 1983 liability against the County. First, he contends that he was deprived of his constitutional right to adequate mental health care as a result of the County's own systemic failure in management of the Jail. Second, Townsend contends that the County is liable for any injuries caused by the constitutionally inadequate policies, customs, or training of its contractors, Telecare and CFMG. The County argues that it is entitled to summary judgment on Claim 1 with respect to both theories. The Court addresses these theories in reverse order.

**a.      Contractors' Policies**

Townsend seeks to hold the County liable for the asserted constitutional violations arising from the policies of Telecare and CFMG. CFMG is entitled to summary judgment, so its policies are not at issue. With respect to Telecare, the County's failure to ensure that Telecare provided constitutionally adequate mental health care at the CSP could give rise to liability on the part of the County. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) ("[A] State

United States District Court
Northern District of California

cannot avoid its obligations under federal law by contracting with a third party to perform its functions."). The County did not address this theory of liability in its motion brief.  In its reply, the County argues that it cannot be subject to liability based on Telecare's policies or practices, because the County was not involved in Telecare's policies and decision-making with respect to the CSP.  As discussed above, there is evidence that the County is "so far insinuated into a position of interdependence" with Telecare that Telecare may be considered a state actor under the governmental nexus text.

On the merits of Townsend's claims arising from his 5150 hold, the County argues that § 5150 does not create a liberty interest, and thus release from a § 5150 hold cannot amount to a constitutional violation.  Like Telecare, the County relies on *Cotton* to support this argument.  For the reasons discussed above in connection with Telecare's motion, it is the Court's view that *Cotton* is factually and legally distinguishable from the present case and thus that its reasoning does not apply here.

To the extent the County seeks summary judgment on Claim 1 with respect to the policies and practices of Telecare, that motion is DENIED.

### b.      County's Own Policies

Turning back to Townsend's § 1983 claim grounded in the County's own policies with respect to the Jail, the County argues that it is entitled to summary judgment on the basis that a municipality cannot be held liable under *Monell* unless an individual employee of the municipality also is named as a defendant.  As Townsend points out in his opposition, that statement of the law is plainly incorrect.  In discussing Supreme Court authority on this point, the Ninth Circuit has observed:  "In *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court recognized that the city could be held independently liable under § 1983 for failure to train its police officers even though no individual defendants were sued." *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002).

Next, the County appears to argue that it cannot be liable under *Monell* unless Townsend identifies a prison official who knew of and disregarded a substantial risk to him.  The County's subheading for this section of its brief reads, "Plaintiff Cannot Demonstrate Objective Deliberate

United States District Court
Northern District of California

Indifference Against Any County Involved Person."  County MSJ at 15, ECF 94.  However, because Townsend asserts only *Monell* claims, he need not show a culpable state of mind with respect to any individual Jail staff.  Instead, Townsend must show that the asserted constitutional violation was caused by one or more County policies.  *See Sandoval*, 985 F.3d at 682.  Moreover, the policies in question must amount to objective deliberate indifference to the medical needs of the Jail population.  *See id.*

To restate the elements of *Monell* liability once again, to prevail against the County Townsend must prove:  (1) he had a constitutional right of which he was deprived; (2) the County had a policy; (3) the policy amounted to deliberate indifference to his constitutional right; and (4) the policy was the moving force behind the constitutional violation.  *See Gordon*, 6 F.4th at 973. The County argues that "Plaintiff Cannot Show a Custom or Policy Led to Any Arguable Constitutional Violation."  County MSJ at 20, ECF 94.  According to the County, Townsend has done nothing more than identify several unrelated incidents of in-custody suicides, and has not identified any particular policy that was the moving force behind his attempted suicide.  The County asserts that it provides comprehensive and statutorily compliant mental health services to inmates, providing copies of numerous policies on intake, booking, inmate classification, mental health evaluations, and suicide prevention.  *See* Blechman Decl. Exh. Z, ECF 94-2.  This evidence is sufficient to meet the County's initial burden to show that Townsend cannot establish a constitutionally deficient policy.  The burden thus shifts to Townsend to demonstrate that there are disputed facts with respect to the constitutionality of the County's policies.

Townsend asserts that his deprivation of the right to constitutionally adequate medical and mental health care was not the result of actions of the individual correctional officers at the jail, but rather as a result of "the collective inaction" of the Jail staff as a whole.  This is a viable theory of *Monell* liability under Ninth Circuit law.  *See Fairley*, 281 F.3d at 917.  Townsend's jail expert, Gary Raney, has identified multiple systemic problems at the Jail that, combined, could be found constitutionally deficient.  *See* Scruggs Decl. Exh. 11, ECF 103.  According to Raney, the Jail screening process was insufficient, there were insufficient processes in place for sharing of relevant information, and there was insufficient training of jail staff regarding housing

1    classifications.  *See id.*  A jury could conclude from this evidence that there was a breakdown in

2    the effective functioning of the Jail that resulted in the failure to transmit the arresting officer's

3    knowledge that Townsend had ingested heroin to Jail screening personnel; screening personnel's

4    failure to consider all relevant information in Townsend's chart; and a failure to communicate

5    prior suicidal ideation and drug use to classification officers.

6            The County argues that Townsend cannot establish causation.  However, a jury could

7    conclude that absent the asserted systemwide failure of policies and training, Townsend's request

8    to be housed in a single cell, RTC, would not have been honored.  Similarly, a jury could find that

9    had Dr. Friedman been given more training, she might have spent more than one minute on his

10   mental health assessment and placed him in a suicide cell.  In the Court's view, these are

11   reasonable inferences that may be drawn from Townsend's evidence of a systemic failure.  These

12   inferences are distinguishable from the chain of speculation underlying Townsend's theory of

13   liability against CFMG grounded in Miller's failure to consider the drug information on his chart,

14   because Townsend asserts that the systemic failure of adequate Jail policies as a whole led to his

15   injurie.

16           The County argues that Townsend cannot established that the asserted systemic failure is

17   the result of deliberate indifference on the part of the County.  Townsend submits expert opinions

18   of  a forensic psychiatrist, a correctional psychologist, and a jail expert, all of whom opine that the

19   County had notice of the constitutional inadequacies of the Jail policies and procedures.  *See*

20   Scruggs Decl. Exhs. 4, 7, 11, ECF 103.  The County's objections to those expert opinions is

21   OVERRULED.  While the Court agrees that some portions of the reports contain improper

22   opinions regarding the ultimate legal issues, the Court has not considered those portions.

23   However, a jury could find, based on the admissible portions of these expert opinions, that the

24   County had notice of the deficiencies in its policies, procedures, and training, and was deliberately

25   indifferent to the serious medical and mental health needs of Jail inmates.

26           The County's motion for summary judgment on Claim 1 is DENIED.

27                    **2.       Claim 2 – ADA and Rehabilitation Act**

28           With respect to Claim 2, Townsend claims that the County discriminated against him on

United States District Court
Northern District of California

the basis of his severe mental disability, and failed to accommodate his severe mental disability. this claim is brought under Title II and the Rehabilitation Act. *See* FAC ¶¶ 81 ("Defendant County is therefore liable under Title II of the ADA for the unlawful acts of its employees as well as its private-entity contractors Telecare and CFMG."); 84 ("Defendant County receives federal assistance and funds, and is therefore subject to the Rehabilitation Act.").

The County is entitled to summary judgment on Claim 2 for the same reasons discussed above in connection with Telecare and CFMG.  The County has met its burden on summary judgment by pointing to an absence of evidence in the record from which a jury could find that the County discriminated against Townsend, or failed to accommodate him, on the basis of his disability.  Townsend has not identified any evidence in the record from which a jury could find for him on this point.

The County's motion for summary judgment on Claim 2 is GRANTED.

## IV.  ORDER

(1)  Telecare's motion for summary judgment or, in the alternative, partial summary judgment is GRANTED as to Claim 2 and DENIED as to Claim 1;

(2)  CFMG's motion for summary judgment or, in the alternative, partial summary judgment is GRANTED as to Claim 1 and Claim 2;

(3)  The County's motion for summary judgment or, in the alternative, partial summary judgment is GRANTED as to Claim 2 and DENIED as to Claim 1; and

(4)  This order terminates ECF 90, 91, and 94.

Dated:  September 1, 2021

BETH LABSON FREEMAN
United States District Judge